**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT SOUTH BEND**

| | | |
|---|---|---|
| DEBORAH SULLIVAN BROWN, *et al.*, | ) | |
| | ) | |
| Plaintiffs / Counter Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | Cause No. 3:20-CV-680-PPS |
| ROSARIO SCALISE, | ) | |
| | ) | |
| Defendant / Counter Claimant. | ) | |
| | ) | |

## OPINION AND ORDER

At its core, this case concerns what it means to be a good neighbor. It is a cautionary tale of the extreme breakdown of the relationship between owners of neighboring beachfront properties in Michigan City, Indiana. The Plaintiffs are Deborah and Gerry Brown and David Broitman who was the Successor Trustee of his father's trust. The Browns bought the home that lies at the center of this dispute from the Broitman trust. For ease of reference, I will refer to the Broitman trust as simply "Broitman." The property at issue is located at 208 Louisiana Avenue, Michigan City, Indiana (the "208 Property"). Defendant Rosario Scalise is the owner of two neighboring properties located at 206 and 204 Louisiana Avenue (the "206 Property" and the "204 Property").[1] The 206 Property borders the west side, and the 204 Property borders the south side of the 206 Property, respectively.

---

[1] Scalise contested diversity jurisdiction, but Judge Miller, who was previously assigned the case, denied Scalise's motion to dismiss for lack for lack of subject matter jurisdiction and held that diversity jurisdiction exists. [DE 20.]

This case involves two principal issues: the validity of an easement on the 208 Property and whether Scalise caused property damage to his neighbor's home during the construction activity on his properties. In July 2023, Judge Miller granted in part Scalise's motion for summary judgment that pared down the Browns' and Broitman's claims, including by limiting the Plaintiffs' property damage claims to the respective periods that they owned the 208 Property. [DE 71.]

Beginning on January 6 and concluding on January 13, 2025, the Parties proceeded to a five-day bench trial on three issues: (1) The Browns' request for a declaratory judgment that Scalise abandoned an ingress/egress easement on the 208 Property or, conversely, Scalise's request for a declaratory judgment that the easement is still enforceable; (2) Broitman's property damage claim; and (3) the Browns' property damage claim. [DE 102; DE 103; DE 104; DE 105; DE 106.] The Parties submitted proposed findings of fact and conclusions of law as well as trial briefs prior to trial. [DE 92; DE 94; DE 96; DE 97.] They subsequently filed supplemental proposed findings of fact and law, and responses to the same, after trial. [DE 109; DE 110; DE 111; DE 112.]

Having considered the Parties' arguments and the evidence submitted, I now make the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any finding of fact is deemed to be a conclusion of law, it is incorporated as such, and vice versa.

## Findings of Fact

In order to make the following facts more comprehensible, and because a picture is worth a thousand words, here is a photograph showing the three pertinent lots:



[DE 59 at 2.] (For further orientation, north is at the top of this photo.) In 1969, the then

owners of the 206 and 208 Properties entered into an express easement agreement (the

"Easement Agreement"). [DE 1-3; DE 71 at 3.] The easement in question runs between

the 208 and 204 Properties (but is contained entirely on the 208 Property) and provides

access to the 206 Property. At the time the easement was drafted, the 206 Property was

landlocked because the 208 Property sat in between the 206 Property and Louisiana

Avenue to the east. Here is how the easement is described in the Easement Agreement:

it is a "concrete walkway [located on the south 11.5' feet of the 208 Property]

approximately thirty-six inches (36) wide by fifty feet (50) long (more or less) used as

ingress to and egress from Louisiana Avenue and [the 206 Property]." [DE 1-3 at 1.] The

Easement Agreement further provides that the concrete walkway "be perpetually used

3

as an easement for ingress and egress." [*Id*. at 2.] In addition, the Easement Agreement required that the concrete walkway "shall, at all times, be unobstructed" and granted to the 206 Property a "right to keep the concrete walk repaired and useable." [*Id*.]

Broitman bought the 208 Property in the 1970s. [DE 71 at 3.] Thereafter, in 2018, Scalise began to evaluate a potential purchase of both the 206 and 204 Properties. [DE 94 at ¶¶3–10.] Scalise learned that a deck located on the northwest corner and a landing for a western-facing door of the 208 Property encroached on the 206 Property. [*Id*. at ¶4.] The deck in the northwestern corner of the 208 Property appears to have been built in approximately 1985. [*See* Pltfs. Exh. 26.][2] Scalise approached Broitman about these encroachments, and the two sides on December 14, 2018, entered into a written agreement that (1) permitted the deck and landing to remain where they were in exchange for waiver of a claim of adverse possession; and (2) acknowledged that if the deck or landing were damaged or destroyed, they could not be reconstructed. [DE 55-6 at 91–94.] Scalise subsequently completed his purchase of the 206 and 204 Properties. [DE 94 at ¶10.]

Around 2015, Broitman began to rent the 208 Property to summer beachgoers and later employed the rental management service Beachwalk Properties to do so. No evidence was presented at trial about the rental history of the 208 Property. In other words, there was no evidence as to how often the 208 Property was actually rented from 2015 through 2018 or what the amount of any rental income was, if any. Sometime after

---

[2] In referencing exhibits tendered **Error! Main Document Only.**by the Parties, I will uniformly cite to Plaintiffs' admitted exhibits as "Pltfs. Exh. #," and Defendant's admitted exhibits as "Def. Exh. #," as these documents have not been electronically filed on the docket.

buying the adjacent properties, Scalise became aware that Broitman occasionally used the 208 Property for short term rentals.

In the spring of 2019, Scalise hired a contractor to demolish and clear the existing house on the 206 Property. [DE 94 at ¶14.] Scalise then began construction of a new house on the property. [*Id*. at ¶16.] And it was an inauspicious start. In late May or early June 2019, Scalise began trenching activities to the west of the 208 Property along the eastern edge of his 206 Property. In the process, while using a piece of heavy equipment, Scalise inadvertently knocked down the western landing and stairs of the 208 Property. Broitman testified that Scalise did not ask for permission to remove this landing and did not offer to reimburse Broitman for its destruction. Scalise also admits that he trespassed on his neighbor's property by nailing shut the westward facing door on the 208 Property, which had previously opened onto the landing that Scalise had knocked down. [*See* Pltfs. Exh. 19 at Bates 25, Bates 27.][3] Scalise claims he nailed the door shut to guard against anyone opening the door and injuring themselves because of the several foot drop that now existed due to the destruction of the landing and the steps. Of note, at trial neither Broitman nor Scalise presented evidence of Broitman renting the 208 Property to short-term renters after the destruction of the landing until August 2019 (which I will get to in a minute).

Thereafter, Scalise decided to install a new lateral sewer line under the easement area that would connect his new home on the 206 Property to the sewer main located

---

[3] There is no uniform pagination system across Plaintiffs' and Defendant's exhibits. For those exhibits that do not contain internal page numbers, I cite to the Bates number of the document.

under Louisiana Avenue. [DE 94 at ¶17.] Scalise testified that he believed that he could place his new utilities under the easement. A plain reading of the terms of the easement flatly contradicts that assumption.

On the evening of July 30, 2019, Scalise texted Broitman: "The sewer contractor will start [to] excavate tomorrow. To install sewer and water. In the event they need to remove the concrete block wall. Please tell me where you want me to store them." [Def. Exh. W at 1.] Scalise's reference to the "concrete block wall" was to a retaining wall that ran along the north end of the easement walkway on the 208 Property. [Pltfs. Exh. 27.] Later in the evening of July 30, Broitman responded to Scalise with some degree of understandable alarm: "What do you mean 'in the event they need to remove wall'? You are informing us less than 24 hours before you start, that I need to make a plan for the destruction of my block retaining wall." [Def. Exh. W at 1.] Broitman asked Scalise to "reroute the sewer line so you do not disturb [the 208 Property]" and stated, "[t]he sewer line should come through the 204 property, I am very concerned your contractor will cause or create major stress damage to our property." [*Id*. at 2.]

On occasion, representatives from Beachwalk Properties also communicated with Scalise, sometimes directly and sometimes as an intermediary between Scalise and Broitman. Broitman testified that Beachwalk Properties and Scalise corresponded concerning the excavation plan because renters were staying at the 208 Property at the time. There were no further text communications between Broitman and Scalise until August 9, 2019. According to Scalise, he waited nine to ten days after the initial July text

exchange to begin excavation so that Broitman's renters at the 208 Property could finish their stay.

Scalise resumed his efforts to dig up the easement walkway and lay his new utilities on August 9, 2019. Scalise first removed all the landscaping that lined the south and west brick foundation walls of the 208 Property. In the process, Scalise discovered several cracks in the south and west brick foundation walls, including most notably a large crack between bricks near the southwest corner of the west wall. [Def. Exh. dd at 3–6.] Scalise photographed these cracks on August 9, 2019. [*Id*. at 5–6.][4] Scalise could not pass through the easement area with his excavator, so he appears to have intentionally removed the retaining wall north of the walkway to allow passage for his excavator.

On August 9 and 10, 2019, Broitman sent additional text messages to Scalise concerning Scalise's construction crew parking on the 208 Property and an issue with the water main for the 208 Property. [Def. Exh. W at 2.] Evidently, the collapse of the retaining wall caused the water main that serviced the 208 Property to break. There again happened to be short term renters in the 208 Property at the time and they were understandably displeased. This prompted Broitman to text Scalise and advise him of the "need to inform our renter if there is a prospect of continued water outage." [*Id*.] Broitman explained that the timing of Scalise's work was "very bad" because Broitman was "at the start of a 9 day rental" on the 208 Property. [*Id*.] Broitman asked Scalise to "stop work until September." [*Id*.]

---

[4] Scalise did not send these pictures to Broitman until September 17, 2019. [Def. Exh. W at 10–11.]

On August 12, 2019, Scalise began his trenching work to install the new utility lines under the easement area and connect them to his new home on the 206 Property. Scalise and his construction team removed the concrete walkway, and Scalise personally operated an excavator to dig a several foot deep trench along the easement area south of the 208 Property. By the afternoon of August 12, Scalise's construction team had installed a metal retaining wall on the south wall of the trench (the side closer to the 204 Property) and were laying utility piping. [*See* Def. Exh. cc at 22–25.]

On August 15, Broitman sent Scalise a picture of the easement walkway prior to its removal by Scalise and inquired about the catch basins and drains that were removed from the walkway. [Def. Exh. W at 3.] Scalise said he had kept all the materials he removed and would "put it together like before." [*Id.*] Scalise on August 20 sent pictures of a newly poured concrete walkway on a portion of the easement area that connected Louisiana Avenue to a separate walkway that led to the eastern-facing front door of the 208 Property. [*Id.* at 4–7.] Broitman responded: "Looking better." [*Id.* at 7.] Scalise and Broitman testified that Scalise reinstalled this portion of the walkway so that Broitman's renters could access the door to the 208 Property.

Scalise continued unabated with his trenching efforts and in the process unintentionally damaged a sewer line servicing the 208 Property that encroached on the 206 Property. Unbeknownst to seemingly everyone, including Michigan City, the 208 Property used a community lateral sewer line that began in the southwest corner of the 208 Property, extended westward onto the 206 Property, and connected to a shared

8

lateral line with the 206 and 204 properties that then ran south to connect with the sewer main under Colfax Avenue. [*See* Def. Exh. S at 3.]

On August 24, 2019, Broitman texted Scalise: "I'm being told you disconnected the sewer line from my house. Sewage is not draining . . . . This can not wait are you on site today?" [Def. Exh. W at 7.] Broitman also sent a picture of a proposed configuration for a new sewer line. [*Id*. at 8.] Broitman testified that Beachwalk put the plan together to restore service for the renters at the 208 Property. Scalise responded: "I'm on the way. We will discuss when I get to site." [*Id*. at 9.] Scalise testified that he arrived at the 208 Property and gave Broitman's renters the keys to his 204 Property so that they could use the bathroom facilities there until Scalise could reinstall a sewer line for the 208 Property. Broitman testified that he lost the nine-day rental because of the sewer disconnect and could not rent his property for the remainder of the summer season.

Broitman appears to have called the Sanitary District of Michigan City on August 27, 2019. [Pltfs. Exh. 38 at 1.] That same day, Scalise said that Sanitary District officials arrived at the 208 Property and instructed Scalise to install a temporary community lateral that connected the 208 Property to the new sewer lateral Scalise had installed for the 206 Property under the easement area. [*See* Def. Exh. S at 4.] This community lateral would restore sewer service to the 208 Property by allowing it to use the 206 Property's new lateral line. Scalise personally installed the community lateral for the 208 Property on August 27. [*See* Def. Exh. cc at 31–32.]

On August 29, 2019, the Sanitary District sent a letter to Broitman that memorialized the installation of the community lateral and noted that Scalise "may

have violated the terms and conditions of his lateral tap permit . . . by disrupting your flow, but he corrected the problem very quickly by providing you a temporary sewage connection[.]" [Def. Exh. S at 1.] The Sanitary District set a December 31, 2019, deadline for Broitman to install a new lateral connecting the 208 Property to the sewer main that did not involve use of a community lateral (which are prohibited by Michigan City) and which did not trespass on the 206 or 204 Properties. [*Id.*] Scalise testified that he, per the Sanitary District's instructions, did not reinstall the remaining portion of the walkway in the easement area. This was sensible; repairing the sidewalk would have required Broitman to dig it back up again when he installed a new lateral for the 208 Property.

Broitman continued to exchange emails with the Sanitary District throughout August and September 2019 concerning the situation with his sewer line. [*See* Def. Exh. V.] On September 17, 2019, Michael Kuss of the Sanitary District provided Broitman with the Michigan City Lateral Tap Application that he would need to complete to install a new sewer lateral for the 208 Property. [*Id.* at 9–14.]

As noted above, on September 17, 2019, Scalise texted Broitman two pictures of cracks visible in the exterior brick of the south wall of the foundation for the 208 Property. [Def. Exh. W at 10–11.] These appear to be the same pictures Scalise took on August 9, 2019. In response to Scalise's trenching activities, Broitman, on September 19, 2019, called the Michigan City Police Department to accuse Scalise of criminal mischief for his removal of the 208 Property's landing. [Pltfs. Exh. 11 at 2.] An officer visited the 208 Property to make a report, per Broitman's request, so that Broitman could make an insurance claim. [*Id.*] Scalise later continued his trenching activities in a new north-

10

south trench dug between the 206 and 208 Properties, and by November 2, 2019, new utility lines had been laid. [Def. Exh. hh.]

Around this time, Broitman decided that he had had enough. It became clear to him that management of the 208 Property had become more work than it was worth, so he decided to sell the home. As fate would have it, Deborah and Gerry Brown were looking for lakefront property in the area. Ms. Brown is a lawyer who has practiced for several decades. Some of her law practice over the years has been in real estate. On November 4, 2019, Deborah Brown emailed her realtor Kris Hallock to indicate her interest in the newly listed 208 Property. [Def. Exh. vv at 1.] (Given the centrality that she has to this dispute, I will refer to Deborah Brown in this Order as "Brown" unless specificity in regard to her husband Gerry requires otherwise).

Brown testified that she visited the 208 Property later that day and toured the inside of the house. She testified she saw construction debris and sand to the south of the property on the easement area. Brown testified that she does not think she inspected the foundation of the 208 Property during this first visit. To be sure, the Browns were highly motivated buyers. Indeed, the next day, November 5, the Browns signed a purchase agreement to purchase the 208 Property "as-is", subject to the Browns' approval of the survey report. [Pltfs. Exh. 24 at Bates 491.] The purchase agreement also gave the Browns the ability to inspect the property and cancel the sale if the inspection revealed the need for repairs exceeding $10,000. [*Id.*] Nevertheless, Brown never actually conducted an inspection of the property prior to closing. Brown did, however, order a boundary survey. [Def. Exh. vv at 17–22.]

The Browns paid $599,000 for the property, which was Broitman's full asking price. At the time she signed the purchase agreement, Brown testified that she understood that there was an ongoing issue relating to the sewer, but she did not understand the full extent of it.

The purchase agreement documents included a Seller's Residential Real Estate Sales Disclosure form. [Pltfs. Exh. 24 at Bates 500–01.] Broitman appears to have completed the form on September 25, 2019. [*Id.*] Broitman answered every question on the Disclosure form except one. He conspicuously left unanswered the following question: "Are there any foundation problems with the structure?" [*Id.* at 501.] Despite receipt on September 17, 2019, of pictures of two large cracks in the exterior of the 208 Property's foundation, Broitman testified that he was not aware of any damage to the 208 Property's foundation at the time of the purchase agreement or closing. The Browns signed the disclosure form on November 5, 2019. [*Id.*] The Browns never followed up with Broitman about his refusal to answer the relevant question in the Sales Disclosure form about whether there were any foundation problems at the home.

By November 14, 2019, Brown had collected additional information concerning the sewer issue for the 208 Property. On November 18, 2019, the Browns' attorney received the title information for the 208 Property and sent a copy to Brown. [Def. Exh. vv at 11–12.] Brown testified that she wrote down various notes on the title document which were provided as Plaintiffs' Exhibit 24. Brown underlined and starred the disclosure about the August 1969 easement across the 208 Property and testified that this may have been the first time she had knowledge of the easement. [Pltfs. Exh. 24 at

Bates 514.] Brown emailed her realtor on November 19 requesting a copy of the 1969 easement. [Def. Exh. vv at 10.]

She testified that Scalise's attorney asked whether the Browns would allow Scalise's sewer line to remain under the easement area. Concerned that Broitman would permit Scalise to maintain his sewer line under the easement area, the Browns and Broitman negotiated a second amendment to the purchase agreement. In Amendment 2, executed by both Parties by November 18, the Browns agreed not to hold Broitman responsible for the relocation and reconnection of the sewer lateral; it was further agreed that the Browns would assume all responsibility for dealing with any possible utility easement. [Pltfs. Exh. 24 at Bates 499.] The Browns and Broitman executed Amendment 1 to the purchase agreement on or near the same day as the date of the purchase agreement, but that Amendment is not relevant here. [*Id*. at Bates 497.] For his part, in Amendment 2 Broitman agreed not to enter into "any legal easements related to the sewer line." [*Id*. at 499] Brown testified that she was aware at closing of the Sanitary Department's order to reconfigure the 208 Property sewer by December 31, 2019.

The Browns next visited the 208 Property for a final walkthrough prior to the closing on December 11, 2019. Brown said she entered the basement during this final walkthrough, but she did not enter the crawl space or thoroughly examine the western foundation wall. Brown testified that she did not see any cracks in the exterior foundation when she walked around the 208 Property during closing, although photographs taken earlier plainly show cracking in the foundation walls. After the final

walkthrough, the closing went off without incident with the Browns paying cash for the house.

The relationship between the Browns and Scalise began in January 2020, and it was sour from the start. According to Brown, Scalise told her and her husband during their first meeting not to rent the 208 Property and encouraged them to tear down the home because it had no value. Scalise denied making either statement. Brown had been in touch with Scalise's then attorney, Barry McDonnell, since November 2019 to discuss the sewer and easement issues as they related to Broitman's sale of the 208 Property to the Browns. [*See* Pltfs. Exh. 16 at Bates 95–104.] In an email to Attorney McDonnell, Brown told McDonnell that Scalise erroneously believed that the easement "afforded him the right to use it as a utility easement" and she had asked Scalise to "move all his utilities on his own property." [*Id*. at Bates 101–02.] In addition, Brown wrote:

> We assume that the old sidewalk ingress/egress easement has no use for [Scalise] since he now owns the neighboring lot on Louisiana Street providing ample access to his home, and the sidewalk has even been removed, presumably by [Scalise]. Would [Scalise] be agreeable to legally extinguishing the old easement?

[*Id*. at Bates 102.] McDonnell on January 6, 2020, said he had forwarded Brown's message to Scalise. [*Id*. at Bates 101.] After receiving the message, Scalise flatly declined the offer to extinguish the easement.

The evidence was contradictory about what the Browns' intentions were when they bought the 208 Property. On the one hand, Brown testified that she was undecided whether to tear down the home and build a new one or renovate the existing structure. On the other, there is strong documentary evidence that suggests Brown intended to

tear down the existing home all along. For example, on March 30, 2020, in a letter to Scalise, Brown told him that she had "plans for new construction . . . ." [Pltfs. Exh. 12 at Bates 94.] She reiterated this in correspondence in December 2020 and February 2021 in which Brown reached out to contractors about building a new home. [Def. Exh. fff at 3–5.] The record is replete with other examples. It is true there is also evidence that Brown contemplated keeping the existing house and shoring up the foundation. But she also had an ulterior motive in making it appear that repairing the home was her preferred option: making her lawsuit stronger. That is demonstrated by Brown's attempt to steer one contractor into putting certain things into his repair estimate that would help her case. [Def. Exh. uu.]

On January 27, 2020, Brown emailed McDonnell concerning a plastic pipe attached to one of Scalise's downspouts on the 206 Property and directed at the western foundation of the 208 Property. [Pltfs. Exh. 16 at Bates 100.] A photo, taken January 25, 2020, was introduced at trial depicting this:



[Pltfs. Exh. 17 at Bates 34.]

McDonnell instructed Brown to contact Scalise directly. [Pltfs. Exh. 16 at Bates 99.] Brown did contact Scalise, and he testified that he promptly relocated the downspout away from the 208 Property. Brown says it took him eight months to move the downspout. I credit Scalise's testimony in this regard. I do so because about a month later, on March 30, 2020, Brown sent Scalise a comprehensive letter (on her law firm stationery) documenting a conversation they had had a few days earlier. [Pltfs. Exh. 12.] Tellingly, in this lengthy correspondence recounting their various disputes, there is no mention of the downspout being a problem any longer. [*Id*.] This suggests to me that Scalise did in fact move the downspout promptly after being told about it.

What the March 30 letter does address is the ongoing issue with the sewer line. In the letter Brown says that Scalise told her he intended to remove the sewer line servicing his 206 Property from the easement area. [*Id*. at Bates 93.] Brown wrote that she and Scalise also discussed the easement and that Scalise "verbally advised me . . . that you had no intention of using the granted ingress and egress easement, as you no longer needed it." [*Id*.] Brown detailed her view that Scalise had abandoned the easement under Indiana law, reiterated her request that Scalise sign a document expressly terminating the easement, and encouraged Scalise to seek legal counsel. [*Id*.]

Also in March 2020, Brown testified that she first entered the crawlspace area of the basement and noticed a large crack in the western foundation wall. Brown took two pictures of the crack in the wall. [Pltfs. Exh. 18 at Bates 28–29.] But from March 2020 to February 2021 Brown did not seek any professional consultation regarding the cracks in

the foundation wall. This was so despite the fact that Brown had an ongoing relationship with Rick Keller, a structural engineer, who she had used on previous house flipping projects.

Because the easement between the 204 Property and the 208 Property was only a surface easement, Scalise needed to reroute the utilities that he had mistakenly placed under the easement. To deal with the issue, Scalise decided to tear down his home on the 204 Property in approximately May of 2020 so that he could reroute the utilities for his newly built home on the 206 Property. Around that time, Brown had another conversation with Scalise concerning the easement. According to Brown, Scalise repeated that he did not need the easement, but he again would not sign an agreement extinguishing the easement. Brown said she also raised her concerns about the crack in the western wall of the foundation and Scalise's operation and parking of heavy machinery close to that wall. This angered Scalise. Scalise told Brown that he knew what she was up to, and that he believed it was Brown's intent to file a lawsuit.

In June and July 2020, Brown exchanged emails with Michael Kuss of the Michigan City Sanitary District regarding the ongoing sewer dispute. Kuss emailed Brown a letter dated July 7, 2020, that summarized the dispute and Michigan City's mediation efforts. [*See* Pltfs. Exh. 13 at Bates 111–12.] Kuss explained that Scalise had since learned that the easement is "not a utility easement, and Mr. Scalise understands that he needs to install a new private lateral sewer that is not on the property of 208 Louisiana. Mr. Scalise plans to conduct this work next week." [*Id*. at Bates 111.] Kuss further explained that a small portion of the temporary common lateral installed by

Scalise in August 2019 for the 208 Property remained on the 206 Property. [*Id.* at Bates 112.] As a result, "Scalise has agreed to leave the newly installed private sanitary sewer lateral on your property for you to use [that runs under the easement], but he insists the small portion of your private sewer lateral be removed from his property." [*Id.*] Kuss wrote: "After some discussion, you explained that it is agreeable to you, to simply have Mr. Scalise disconnect and properly cap your private sanitary sewer lateral pipes just inside your property line." [*Id.*] Kuss included an agreement form that memorialized the substance of the plan for Scalise to cap the Browns' sewer line. [*Id.* at Bates 114.] Both Brown and Scalise appear to have signed the agreement by July 8, 2020. [*Id.* at Bates 109.]

On July 13, 2020, Kuss emailed Brown to confirm that he witnessed the private sewer lateral for the 208 Property be "disconnected and cemented closed." [*Id.* at Bates 107.] Brown asked whether the same company could also reconnect the Browns' sewer and wrote: "I assume we should get our sewer hooked up before Mr. Scalise proceeds to replace the sidewalk, if that is his intention. Perhaps this should be mentioned to him." [*Id.*] Kuss noted that Scalise performed the sewer work himself, and Brown responded: "It will be almost impossible to hook up our sewer without damage to the sidewalk if he puts it in before we get done." [*Id.* at Bates 106.]

On July 27, 2020, Kuss emailed Brown requesting an update on the sewer replacement for the 208 Property. [Def. Exh. Z at 4.] During the exchange, Brown told Kuss about a leak inside the basement that the prior owner (Broitman) had told her

contractor about. [*Id*. at 2.] Kuss responded: "Did you have a house inspection

conducted before you bought the home?" [*Id*.] In response, Brown wrote:

> No. We did not ask for a house inspection. We figured we wanted to keep
> the deal as clean as possible and to make sure they accepted our offer.
> Plus, we have restored a number of old houses, we looked at what we
> thought was important and were satisfied. We knew there were some
> problems, but repairable.

[*Id*. at 1.]

Scalise's prediction of an impending lawsuit proved true. The Browns and

Broitman filed this case on August 14, 2020. [DE 1.] The matter was assigned to Judge

Miller. In the complaint, the Browns never requested an injunction, preliminary or

otherwise, to halt Scalise's work on his home for fear that it was harming the Browns'

home on the 208 Property.

Kuss again followed up with Brown on August 24, 2020, to inquire whether she

installed the new sewer lateral for the 208 Property. [Def. Exh. aa at 2.] Brown

confirmed she had not, adding that "I do not consider ours to be an emergency, since

we are not using the house now." [*Id*.] Kuss acknowledged that the replacement was

not an emergency but replied: "you also know that Mr. Scalise wants to pour the

sidewalk, so it is an urgent matter. I have been telling him to wait . . . and [Scalise] has

been waiting because I asked him to." [*Id*. at 1.] Brown wrote: "We appreciate you

asking Scalise to wait and we greatly appreciate your help in this matter." [*Id*.] By at

least September 23, 2020, Scalise had repoured a concrete walkway along the length of

the easement area. [*See* Pltfs. Exh. 53 at Scalise Supp. Resp. 24.]

Brown testified that she continued to have conversations with her contractor about reconnecting the sewer lateral for the 208 Property throughout the fall of 2020. For various reasons it did not get reconnected for another nine months. The contractor appears to have connected the new sewer lateral for the 208 Property on approximately June 10, 2021. [*See* Def. Exh. ee at 11–12.] But the process was ugly. Scalise interfered with the work by using his equipment to block Brown's contractor's equipment from entering the easement area. The matter only got resolved once the Michigan City Police Department got involved. Scalise admitted that he blocked the contractor's efforts with the use of his forklift, but he did it because the contractor was trespassing with his heavy machinery on the 204 Property.

Throughout February 2021, as referenced above, Brown began to contact various builders to receive designs and quotes for construction of a new home on the 208 Property. [*See* Def. Exh. ccc; Def. Exh. ddd.] By August and September 2021, the Browns also began to solicit quotes for repair work to shore up the cracked foundation walls. [*See* Pltfs. Exh. 8.] For example, the Browns received a quote from Ziolkowski Construction for the demolition and re-layering of the brick portions of the south and west foundation walls. Chris Siebenhaar testified that this quote did not include any replacement or repair work to the concrete footing under the brick for those two walls, so the actual cost to repair would have been higher. (Siebenhaar is the witness referenced above that Brown tried to steer into putting certain things in his estimate that would assist with her lawsuit. *See* Def. Exh. uu.) At trial, Siebenhaar said he was not aware that the foundation walls had been damaged since at least March of 2020 and

agreed that the walls could have been repaired differently, and possibly for less money, if the repairs had been performed earlier.

Relative to the issue with the foundation of the 208 Property, in April 2022, the Browns finally asked their acquaintance, Rick Keller (the civil engineer referenced above), to conduct an inspection of the home; Keller's inspection occurred on April 27, 2022. [Pltfs. Exh. 64A at 1.] Keller is experienced in structural building restoration and renovation. Keller admitted on cross-examination that he did not know the state of the 208 Property's foundation prior to April 2022. Keller documented his inspection in a May 5, 2022, report. [*See id*.] Keller commented on the removal of the easement sidewalk and shrubbery south of the 208 Property, and he noted the removal of the western landing. [*Id*. at 2–3.] Keller also commented on Scalise's construction activities on the west side of the 208 Property, which he concluded "caused the foundation wall in the crawlspace to crack and push inward." [*Id*. at 4.] Keller included pictures of a crack on the exterior and interior of the west foundation wall. [*Id*.]

Keller attributed an exterior crack in the southwest corner of the foundation as caused by the foundation wall being "pushed in close to the corner", which caused a twisting effect that resulted in the crack. [*Id*. at 5.] Keller documented other "fresh cracks" on the south foundation wall that he said were caused when Scalise "excavated through the landscaping." [*Id*. at 8.] Keller concluded that the cracks on the west wall were caused by Scalise operating heavy machinery "immediately adjacent to this wall [which] raised the soil pressure against the wall causing a large section of the wall to

bulge" as well as Scalise's direction of the gutters towards the foundation because "[s]aturated soil adds significant load to foundation walls." [*Id*. at 5, 7.]

Scalise hired his own engineer, Todd Lesperance, who inspected the 208 Property on May 11, 2022. [Pltfs. Exh. 65A at 2.] Scalise retained Lesperance to perform an "engineering investigation" concerning whether the 208 Property "sustained property damage from the excavation to install new underground utilities servicing the [206 Property]." [*Id*. at 1.] In his July 29, 2022, report, Lesperance detailed his walkthrough of the entire 208 Property and his observations at each location. [*See id*. at 2–5.] In the basement and crawlspace areas, Lesperance observed vertical cracks in the brick and concrete footing at "several locations" and bowing of the "rear" and "left" walls of the crawlspace. [*Id*. at 4–5.] Lesperance also identified numerous cracks in the exterior foundation walls. [*Id*. at 5.] Lesperance reviewed historical Google Earth pictures from 2005, 2007, and 2019 and undated county property records that showed a tree near the southwest corner of the 208 Property. [*Id*. at 8–10.] Lesperance concluded that the damage to the 208 Property was caused by tree roots and "the age of the structure" but not by Scalise's construction activities. [*Id*. at 11.] Concerning the cracks in the foundation, Lesperance believed that they were not consistent with what you would expect from downward horizontal and vertical movement, were located in areas unaffected by Scalise's construction efforts, and he noted the lack of "fresh or un-oxidized appearance" in exposed cracks to brick or mortar lines that you would expect from recent damage. [*Id*.]

22

Sometime between April and September 2022, Scalise built a driveway on the 204 Property that ran west from Louisiana Avenue, south of the easement area on the 208 Property, before turning north to run along the west side of the 208 Property and end at Scalise's new home on the 206 Property. Here is a photo of the new driveway after it was installed:



[Pltfs. Exh. 66 at Bates 613.]

Brown testified that Scalise drove a bobcat full of gravel near the south and west walls of the 208 Property and used a compactor to build the driveway. Brown submitted undated photos taken after the 2022 construction of the driveway, one of which she represents was taken in the summer of 2023, that show a partially

constructed sidewalk as well as loose stone slabs and construction cones on the easement area. [*See* Pltfs. Exh. 22 at Bates 590; Pltfs. Exh. 23 at Bates 606.] Scalise also appears to have built a garage on the 204 Property during this same time frame. Brown testified that the cracks in the foundation walls of the 208 Property worsened after Scalise's 2022 construction activity.

Lesperance on September 1, 2022, prepared a report in response to Keller's May 5, 2022, report. Lesperance took issue with Keller's conclusion that "heavy equipment" caused the damage to the 208 Property because Keller did not identify the equipment used, the proximity of its use to the 208 Property, or offer any analysis of the specific impact of the use. [Pltfs. Exh. 65B at 1.] Lesperance calculated the weight of the two pieces of construction equipment used by Scalise in terms of pounds per square foot of ground pressure. [*Id*.] He then compared the results of his calculations to the American Society of Civil Engineer's ("ASCE") Standard ASCE/SEI 7, Minimum Design Loads for Buildings and Other Structures. [*Id*.] Lesperance calculated the "zone of influence" within which additional weight can contribute to force action on a structure. [*Id*. at 2.] Using a 1:1, 45 degree upward extending angle, Lesperance calculated that the zone of influence for the 208 Property extended approximately 2 feet 8 inches from the exterior walls. [*Id*. at 2–3.] Lesperance analyzed pictures of the August 2019 trench to the south and the November 2019 trench to the west of the 208 Property to conclude that the locations of both trenches indicated that the construction equipment used to dig them stayed outside the zone of influence. [*Id*. at 3.] Lesperance concluded: "unless the

equipment encroached to within approximately 2'-8" of the [208 Property], the equipment likely did not cause or contribute to cause damage to the home." [*Id*. at 2–3.]

Keller on October 3, 2022, provided a report in response to Lesperance's September 1, 2022, report. Keller wrote that the ASCE standards were "irrelevant" because the 208 Property predated those standards, which were developed for the purpose of designing new structures. [Pltfs. Exh. 64B at 1.] Keller commented that if the back landing fell in the way Brown told him it did it would have caused the bond between the mortar in the joints to break in the foundation wall. [*Id*. at 2.] Keller included pictures from April 27, 2022, and September 27, 2022, that he said showed the bulge in the foundation wall had worsened. [*Id*. at 2–3.] Keller opined that the sheet piling driven into the ground during trenching south of the 208 Property caused vibrations that led to "settlement of footings and cracks in brick." [*Id*. at 5.] He also took issue with Lesperance's comments on tree damage and pointed to an undated Google Earth image he said showed the vegetation near the 208 Property was not large enough to cause root damage. [*Id*. at 6–7.]

Keller prepared a final report on July 30, 2023, that detailed a July 17, 2023, visit to the 208 Property. Keller noted the construction of a new brick driveway. [Pltfs. Exh. 64C at 1.] Keller observed the driveway to be "3 feet from the back of the Browns['] house . . . . right in the area where the foundation wall was failing and fresh dirt was added along the Brown's foundation wall." [*Id*.] Keller explained that Scalise's use of a plate compactor to compact the gravel base of the driveway vibrated the soil near the 208 Property. [*Id*. at 2.] Keller wrote that the exterior of the west foundation wall had

"shifted inward further since [his] last visit." [*Id*.] He also noted that Scalise parked his van next to the 208 Property. [*Id*.] Keller calculated a 2 ½ inch bulge on the interior of one of the foundation walls and documented what he determined to be new or enlarged cracks in various walls. [*Id*. at 4–6.] Keller opined that different types of mortar could be observed throughout the foundation and was the result of normal tuckpointing. [*Id*. at 6–7.]

**Conclusions of Law**

Following Judge Miller's summary judgment opinion and order [DE 71], two claims remained for trial. *First*, there are dueling declaratory actions. The Browns seek a declaration that the easement between the 208 Property and the 204 Property has been abandoned by Scalise. For his part, Scalise wants his own declaration that the easement remains in full force and effect. At the conclusion of the bench trial in January I advised the parties of my intention to find in favor of Scalise on the easement claim. As I stated at the time, the evidence was plain to me that Scalise never intended to abandon the easement, and indeed, the evidence was quite strong to the contrary. The following will serve to augment my oral ruling. *Second*, there is a claim for property damage brought by both the Browns and Broitman. At the conclusion of the trial, I reserved ruling on this claim. I address both the easement claims and the property damage claims in order below.

**I.    Easement Claims**

As a federal court sitting in diversity jurisdiction, the Parties agree that Indiana law controls this matter. *See Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090

(7th Cir. 1999). Under Indiana law, an express easement can be abandoned if the owner of the easement discontinues all use of the easement with the intention to abandon it. *See e.g., Chickamauga Props., Inc. v. Barnard*, 853 N.E.2d 148, 154 (Ind. Ct. App. 2006). The intent to abandon and put an end to the easement is a necessary element of the claim. *Id.* Mere non-use of an easement does not result in its abandonment. *See Consol. Rail Corp., Inc. v. Lewellen*, 682 N.E.2d 779, 783 (Ind. 1997). Instead, the Indiana Supreme Court has held that "nonuse plus an act indicating an intent to abandon may have had the effect of extinguishing the easement." *Id*.

Plaintiffs argue that Scalise took several actions that evidenced his intent to abandon the easement: he removed the sidewalk and did not intend to replace it, he blocked the easement with his trash and recycling bins, he used the easement for an impermissible purpose (to install utilities), he used alternative pathways (the new driveway) to access the 206 Property, and he expressly told the Browns he intended to abandon the easement. In response, Scalise concedes that he erroneously thought that the easement permitted utilities, but he argues that his actions indicate he intended to replace the walkway and continue use of the easement.

For starters, the Browns' argument that Scalise used the easement for an impermissible purpose is foreclosed by Judge Miller's July 2023 summary judgment opinion. In their pretrial proposed findings of fact, the Browns request this Court to conclude as a matter of law that "[c]hanging the very purpose of the easement from an ingress and egress easement to a utility easement . . . shows Scalise's intent to abandon . . . the easement itself." [DE 96 at ¶61.] But Judge Miller granted summary judgment for

27

Scalise on that claim: "Although these alleged negligent actions and damages are outside the scope of the easement and a burden to the Browns and Broitman[], there isn't sufficient evidence to demonstrate that these burdens can't be severed from the use of the easement." [DE 71 at 14.] Instead, Judge Miller noted that Indiana law favored injunctive relief or a separate claim of trespass or negligence. [*Id.*] I will move on to consider the Plaintiffs' remaining theories that Scalise intended to abandon the easement.

I find that Scalise did not intend to abandon the express ingress-egress easement across the 208 Property. Scalise removed the walkway in August 2019 to lay his new utilities for the 206 Property, but the record reflects that Scalise intended to immediately create a new walkway. Three days after he began his trenching work in the easement area, Scalise texted Broitman that he intended to put the walkway and drains back "together like before." [Def. Exh. W at 3.] Scalise kept the drains and retaining wall bricks he had removed, and he committed to restoring the walkway to look like a picture of the old walkway that Broitman had sent him. In fact, Scalise repoured a section of the easement walkway within a few days of its removal.

While Scalise did not repour the rest of the walkway until September 2020, this delay was at the direct request of the Sanitary District to permit the Browns to redirect the emergency community sewer lateral for the 208 Property. The record reflects a desire by the Sanitary District and Scalise to avoid wastefully repouring the walkway before the Browns fixed their sewer lateral because the Browns would have had to remove the new walkway to perform the necessary sewer work. After the Browns

continued to delay installation of a new sewer connection, Scalise ended up repouring the walkway anyway. This again indicated his intent to continue use of the easement. In the end, it took the Browns over a year to fix the 208 Property's sewer lateral. The Browns, not Scalise, were the ones who dug up the second version of the walkway.

From July 2021 to the present, neither side appears to have replaced the walkway. I still don't view this as evidence of an intent to abandon by Scalise. The Browns' sole argument concerning Scalise's intent to abandon after their July 2021 installation of their new sewer lateral appears to be that Scalise has not rebuilt the walkway a second time. But the present litigation has muddied the waters on drawing any firm conclusions from that fact. Moreover, Scalise appears to have placed concrete slabs over the easement area but somewhat understandably (given the state of the Parties' relationship) did not feel that he could enter the 208 Property to repour a new walkway. And after all, even "intermittent use" or "nonuse" of an easement are insufficient for a finding of abandonment if there is no clear indication of intent to abandon. *See Chickamauga Props., Inc.*, 853 N.E. 2d at 155; *Consol. Rail Corp., Inc.*, 682 N.E. 2d at 783. Whatever the reason Scalise did not repour the walkway a second time, the record is devoid of the necessary element of his intent to abandon.

Brown also claims that Scalise told her that he intended to abandon the easement. Brown testified that he said no such thing. Brown authored a March 2020 letter documenting her view that Scalise made such comments. Perhaps Scalise said something flippantly to Brown along the lines of "I don't even need the easement" or words to that effect. But that is far from a demonstration of the intent to abandon the

easement. And actions speak louder than words; the record is clear that Scalise repeatedly rebuffed Brown's attempts to get him to abandon the easement. She first tried through Scalise's prior lawyer and then directly with Scalise. But on each occasion, Scalise either never responded to Brown's entreaties or he affirmatively told her he had no such intention. For these reasons, I conclude that the Plaintiffs' have failed to prove by a preponderance of the evidence that Scalise had the intention to abandon his easement over the 208 Property. In fact, the issue isn't even close.

Accordingly, I hereby grant Scalise's counterclaim for declaratory relief and decree that the Easement Agreement is valid and enforceable and that the Browns are not entitled to deny or interfere with Scalise's right or access to the easement.

## II.    Property Damage Claims

Indiana law allows a plaintiff to recover damages caused by a defendant's negligent acts. *Neal v. Cure*, 937 N.E.2d 1227, 1236 (Ind. Ct. App. 2010). To prevail upon their tort claims for property damage, Plaintiffs must show: (1) a duty owed to them by Scalise; (2) a breach of that duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by the breach of duty. *See e.g. Smith v. Walsh Constr. Co. II, LLC*, 95 N.E.3d 78, 84 (Ind. Ct. App. 2018); *Neal*, 937 N.E.2d at 1236. Indiana's Crime Victims' Relief Act also allows a plaintiff who suffers a pecuniary loss to recover exemplary damages against a defendant who commits certain property crimes. *See Klinker v. First Merchs. Bank, N.A.*, 964 N.E.2d 190, 193 (Ind. 2012); Ind. Code § 34–24–3–1 (2025).

"Under Indiana law, 'proximate cause' has two aspects: (1) whether the injury would not have occurred without the defendant's negligent act or omission (also referred to as 'causation in fact'); and (2) whether the injury 'is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated.'" *Trask-Morton v. Motel 6 Operating L.P.,* 534 F.3d 672, 677 (7th Cir. 2008) (quoting *City of Gary v. Smith & Wesson Corp.,* 801 N.E.2d 1222, 1243-44 (Ind. 2003)). "[P]roximate cause must be based upon provable facts and cannot be based upon mere guess, conjecture, surmise, possibility or speculation." *Collins v. Am. Optometric Ass'n,* 693 F.2d 636, 640 (7th Cir. 1982) (applying Indiana law) (citation omitted).

Indiana measures damages to real estate in two ways depending on whether the damage is permanent: "(1) if the injury is permanent, the measure of damages is the market value of the real estate before the injury, less the market value after the injury; (2) if the injury to real estate is not permanent, then the measure of damages is the cost of restoration." *Gen. Outdoor Advert. Co., Inc. v. La Salle Realty Corp.*, 141 Ind.App. 247, 218 N.E.2d 141, 150 (1966). Indiana defines permanent injury as "one wherein the cost of restoration exceeds the market value of the building prior to the injury." *Id.* at 151.

Plaintiffs have a broad duty to mitigate damages. "[A] plaintiff in a negligence action has a duty to mitigate his or her post-injury damages, and the amount of damages a plaintiff is entitled to recover is reduced by those damages which reasonable care would have prevented." *Harris v. Jones*, 143 N.E.3d 1012, 1016 (Ind. Ct. App. 2020) (quoting *Willis v. Westerfield*, 839 N.E.2d 1179, 1187 (Ind. 2006)).

A.    Broitman's Claim

Consistent with Judge Miller's summary judgment ruling, both the Browns' and Broitman's negligence claims are limited to the respective periods they owned the 208 Property. [DE 71 at 23-25.] I'll begin with Broitman, who owned the property until December 11, 2019 (the date the Browns closed on the 208 Property and took possession). Broitman seeks money damages that he puts into three buckets: lost rental income, loss of use, and the $100 it cost him to reconnect the water line for the 208 Property. [DE 110 at ¶¶ 11–12.] The loss of use and the lost rental income overlap in this case because, under Indiana law, the damages for loss of use of property is measured "by the reasonable value of the loss of use of the property for the reasonable amount of time required for repair or to obtain a replacement." *Persinger v. Lucas*, 512 N.E.2d 865, 868 (Ind. Ct. App. 1987). This is "measured by the fair or reasonable rental value of the property in the market area." *Id.*

Scalise unquestionably owed Broitman a duty to exercise reasonable care in performing his construction activities near the 208 Property. Broitman argues that Scalise's construction activities breached his duty to exercise reasonable care and caused Broitman to lose reasonable use of his property. Broitman's claim stems from Scalise's sloppy construction activities during the summer of 2019.

It all started around Memorial Day, 2019 when Scalise, while operating a piece of heavy equipment, negligently knocked down the western landing and stairs on the 208 Property. This occurred despite Scalise signing an agreement with Broitman that authorized the landing to remain there even though it was over the property line.

32

Broitman testified that Scalise knocked down the landing in May or June 2019, testimony which I am crediting. Scalise then entered onto Broitman's property and, without Broitman's approval, nailed shut the door that exited to that landing. This was the only access to the rear of the home. These negligent actions by Scalise obviously impaired Broitman's use of his property. It surely made it more difficult to rent in the summer of 2019. Who would knowingly rent a property with a boarded-up back door?

But there was more to come. A couple months later, in August 2019, Scalise started trenching in the easement area to lay utilities for his new house on the 206 Property. Scalise testified at trial that he did not even bother to perform a routine utility locate on his properties or the 208 Property before he began his trenching activities. He then proceeded to dig up the easement area on the 208 Property on a mistaken assumption that he could lay his utilities there. Recall that these actions were directly contrary to the language of the Easement Agreement—it was an ingress/egress easement only, not a utility easement. In the process of trenching, Scalise removed a retaining wall, put up yellow warning tape preventing access to the front door of the 208 Property, drove sheet metal into the trench to hold back the sand, ripped out landscaping, and caused a general nuisance. This was all done on the mistaken assumption that he could do all of this in the easement. What's more, Scalise provided Broitman with limited notice or insight into his trenching activities. Scalise's brutish actions easily constitute a breach of the duty of care that he owed Broitman and plainly impacted Broitman's use of his property.

Scalise also admits that his construction work in the easement area damaged the 208 Property's sewer and water lines. [DE 111 at ¶4.] The Parties agree that Scalise paid for the temporary repair to install the community lateral that restored the 208 Property's sewer line. But Scalise contests as unsupported by documentary evidence Broitman's requested compensation for the $100 water reconnection fee imposed by Michigan City. This part of the dispute is a trifle. In any event, Broitman asserted in a February 2023 declaration that he paid a "$100 water fee for emergency service." [Def. Exh. hhh at ¶8.] I will credit Broitman's testimony at trial and his declaration and award him $100 for the water reconnection fee.

As a measure of damage for the loss of use, Broitman alleges it was difficult to rent the 208 Property during Scalise's obdurate construction activities. Broitman's post-trial briefing calculates the total lost rental income at $2,000 per week. [DE 110 at ¶10.] But this number is at odds with Broitman's February 2023 declaration (admitted into evidence as Def. Exh. hhh) in which he asserts a rental rate of $1,500 per week. [Def. Exh. hhh at ¶8.] Nor does Broitman explain the expansion of his rental season from "through October" (as alleged in his February 2023 affidavit) to "mid-December" (as alleged in his post-trial briefing). [Def. Exh. hhh at ¶8; DE 109 at ¶25; DE 110 at ¶9.] In his February 2023 affidavit, Broitman separately requested $1,250 in rent refunded to the tenants who occupied the 208 Property when Scalise broke the water and sewer lines, "which occurred at the beginning of a 5-day rental", and $250 in rent refunded for "excessive noise complaints and inconvenience." [DE 60-4 at ¶8.] He did not include this request in his post-trial briefing. [*See* DE 110.]

Scalise damaged the sewer and water lines for the 208 Property at different times. Scalise appears to have disconnected the water line for the 208 Property by August 9, 2019. [Def. Exh. w at 2.] This occurred when Scalise negligently caused a retaining wall to collapse near the easement walkway. Broitman texted Scalise that a nine-day rental had just begun. [*Id.*] Scalise later disconnected the 208 Property's sewer line on August 24, 2019. [*Id.* at 7.] Broitman testified that renters were again staying at the 208 Property at this time, though it is not clear to the Court for how long.

Once the water and sewer lines were repaired, Broitman testified that Beachwalk Properties (the real estate company Broitman used) informed him they would no longer rent the 208 Property for the 2019 season. Broitman said this was in part because Beachwalk required at least two doors on a rental property. Recall that Scalise had by this time nailed shut the back door of the 208 Property.

Scalise's negligent construction activities interfered with Broitman's use of his property throughout the summer of 2019. At trial, Broitman testified that the sweet spot for renting the 208 Property (or using it himself) ran from Memorial Day to Labor Day. This is entirely sensible. It is, after all, a summer beach house. This understanding of Broitman's rental season is bolstered by his August 10, 2019, text that asked Scalise to stop his trenching work "until September." [*Id.* at 2.] In addition, there was no evidence that Broitman intended to use the property himself from Labor Day through the date he sold it to the Browns in November. Broitman was residing in Las Vegas at the time and because the home was principally a summer cottage, there is simply no evidence that he or anyone else from his family intended to use it after Labor Day. [*See* Pltfs. Exh. 11 at

Bates 33 (Michigan City Police Department report from September 2019 noting that "Mr. Broitman resides in Las Vegas.").] What's more, Broitman offered no evidence to corroborate his claims of the rental season running through October such as records from previous rental years.

In sum, I find that Scalise was negligent in the following ways: he tore down the western landing of the 208 Property; he then unlawfully entered onto Broitman's property and nailed an exit door shut; he dug an intrusive trench in an easement that was only intended as an ingress/egress easement; he put up yellow warning tape preventing entry to the 208 Property's front door; he collapsed the retaining wall; he tore out landscaping; he severed the sewer line, and he cut off water service. All of these actions made it very difficult for Broitman to enjoy full use of his property from June 3 (the approximate date of the tearing down of the deck) through Labor Day 2019 (the end of the 2019 rental season). That is 13 weeks of what I find is Broitman's loss of use of the property. I will therefore award Broitman damages for loss of use during that time. And the "reasonable rental value" (*see Persinger*, 512 N.E.2d at 868) I will ascribe to that period of time is $1,500 per week, the amount Broitman originally requested. Any losses for specific renters are adequately compensated by this award of weekly lost rental income. I am denying any award for Broitman's loss of use after Labor Day 2019 until the sale to the Browns in December 2019 because there is no credible evidence that there was a market for renters during that period of time or that Broitman intended to use the home himself.

Accordingly, I award Broitman damages of $1,500 per week from June 3, 2019, through Labor Day on September 2, 2019. This is a total of 13 weeks at $1,500 per week or $19,500. I additionally award Broitman the $100 water restoration fee.

### B.    The Browns' Claim

I next turn to the Browns, who assumed ownership of the 208 Property on December 11, 2019. The Browns seek the following categories of damages: (1) lost rental income of $20,000 per year for four years (a total of $80,000); (2) loss of use; and (3) repair expenses. [DE 110 at ¶¶27–29.] According to the Browns, Scalise caused permanent damage to the 208 Property's foundation that results in $343,980 in total damages. [*Id*. at ¶29.] This figure includes the value of the structure on the 208 Property ($177,000) plus the cost of demolition ($166,980). [*Id*.]

The Browns claim Scalise damaged the 208 Property after they acquired ownership in December 2019 in three ways. First, from June 2020 onward Scalise operated and parked heavy machinery within one to four feet of the foundation for the 208 Property. [*Id*. at ¶16.] Second, "over the course of many months in 2020" Scalise directed his downspouts to deposit water towards the west wall (and foundation) of the 208 Property. [*Id*. at ¶19.] The Browns allege that Scalise did not re-direct his downspouts until September 2020. [*Id*.] Third, in 2022 Scalise operated heavy machinery near the south and west walls of the 208 Property, including a vibrating compactor, to build a new driveway on his 204 and 206 properties. [*Id*. at ¶¶17–18.]

Once again, Scalise does not contest that he owed the Browns a reasonable duty of care in his construction activities. He instead contests breach and causation as well as

proof of damages. I'll begin with whether there has been a breach of any duty. The Browns first and third categories of alleged damage assert the same nature of breach: Scalise operated heavy equipment too close to the 208 Property. They point to voluminous, mostly undated photos of construction equipment parked near their home. [*See* Pltfs. Exhs. 17, 19, 21.] Scalise's equipment in several pictures indeed appears to be parked within a few feet of the 208 Property. [Pltfs. Exh. 21 at Bates 544; Pltfs. Exh. 17 at Bates 35–37.]

There are several problems for the Browns in asserting a breach based on the evidence presented. First and most importantly, the activity that the Browns now highlight in their post-trial briefing occurred on Scalise's own property. Scalise was of course entitled to perform construction work on his properties. The western wall of the 208 Property falls along the western property line. There is no setback. [*See* Pltfs. Exh. 24 at Bates 484.] Brown testified that she measured approximately 7.5 feet between the 208 Property and Scalise's new 206 Property. It therefore seems that Scalise built his new home within the locally mandated setback requirement of seven feet and operated heavy machinery on his own property to do so. That the construction work occurred within feet of the 208 Property was the inevitable result of the 208 Property having been built on its western property line border with Scalise's 206 Property. The Browns have simply presented no evidence or Indiana law to support their notion that this breached Scalise's duty of care.

Even if Scalise breached his duty of care, the Browns failed to prove that Scalise's construction activity was the proximate cause of the damage to their foundation walls.

To recap, "proximate cause has two aspects: (1) whether the injury would not have occurred without the defendant's negligent act or omission (also referred to as causation in fact); and (2) whether the injury is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated." *Trask-Morton,* 534 F.3d at 677 (quotations and citations omitted). The Browns failed to meet this burden.

An initial problem is the Browns do not know what their foundation looked like when they purchased the 208 Property. Recall that Brown never went into the crawl space prior to closing on the home and never paid for an inspection. She did nothing more than a cursory walkthrough before making Broitman a full price offer. She says she discovered the cracks in the foundation in March 2020. But there is no evidence as to when those cracks started to propagate.

Here's what we do know. By the Browns' own estimation, the 208 Property was built sometime around 1940. [Pltfs. Exh. 64A at 1.] The foundation was built in sand without any weatherproofing or other modern construction techniques to protect the brick and concrete footings. Sand dunes are not static creatures. They shift over time. Damage to foundations in a dynamic environment like the dunes is not the least bit surprising. What's more, we know there were sizeable cracks in the exterior of the foundation that *predated* the Browns' ownership (as evidenced by Scalise's August 2019 photographs). [Def. Exh. dd at 5–6.] Broitman received pictures of these cracks in September 2019, but he did not disclose the existence of any damage to the 208 Property's foundation in the purchase agreement with the Browns. [Def. Exh. W at 10–

11.] The Browns did not sue Broitman for failing to disclose the foundation issues. In fact, they actually recruited him into this lawsuit and paid all his legal fees. Broitman testified that he had not been in the crawl space area of the 208 Property's basement in years and did not remember what it looked like at the time of the December 2019 sale to the Browns. In short, the Browns failed to present any baseline for the state of the 208 Property's foundation at the time they bought it "as is."

The first evidence presented of the state of the 208 Property's foundation after the Browns' acquired ownership are Brown's March 2020 photographs. [Pltfs. Exh. 18 at Bates 28–29.] These photographs show cracks in the brick wall and concrete footing of the western foundation wall. Brown's photographs contain no indication of the depth or width of these cracks or any measurement of bowing in the wall. Thus, before Scalise began his additional 2020 construction work at issue in this case, the 208 Property's foundation was already in a state of distress and disrepair.

The Browns also failed to present evidence to support the conclusion that the 208 Property's foundation worsened during their ownership because of Scalise's activities. To make this case, the Browns relied upon masonry contractor Chris Siebenhaar and engineer Rick Keller. Siebenhaar presented sparse evidence on causation that can quickly be dismissed. He testified that cracks in the western foundation wall worsened from his 2021 to December 2024 site visits. He provided pictures from both visits, but they do not provide a helpful comparison. The 2021 picture is at an angle and poorly lit while the December 2024 picture is well lit and taken head on instead of at an angle.

40

[Pltfs. Exh. 68.] The December 2024 picture indeed shows serious cracks, but the 2021 photograph leaves me no basis for comparison given the shortcomings I just discussed.

Keller's evidence of causation is also rife with shortcomings. For starters, several of the events Keller attributes as causes of damage occurred before the Browns acquired ownership of the 208 Property. In his May 5, 2022, report that followed this first visit, Keller documented exterior and interior cracks to the south and the west foundation walls. [Pltfs. Exh. 64A at 4–6, 8.] But the exterior crack in the southwest corner already existed on August 9, 2019, prior to the Browns' ownership, and the interior of the western foundation wall was already cracked and bowing when Brown first inspected it in March of 2020. [*See* Def. Exh. dd at 5–6; Pltfs. Exh. 18 at Bates 28–29.] Keller's October 2022 report lists two additional causes of damage to the 208 Property: the collapse of the western landing and the driving of sheet piling into the trench Scalise dug in the easement area. [Pltfs. Exh. 64B at 2, 5.] Once again, both events occurred prior to the Browns' ownership. Broitman testified that Scalise caused the western landing to collapse in May or June of 2019 and we know that Scalise dug and drove the sheet metal into the easement area trench in August 2019. [*See* Def. Exh. cc at 22–25.] Keller does not explain how, even if these events caused the damage in question, that damage had not already occurred by the time the Browns bought the home "as is" and without an inspection.

Moreover, Keller employed no consistent methodology to measure, document, and track the alleged worsening state of the foundation. Instead, he primarily repeats information provided by Brown that he couched in conclusory and incomplete analysis.

Keller testified that the damage to the foundation wall was caused within two years of the date he first inspected the 208 Property in April 2022. Keller's May 2022 photos of the interior of the western foundation wall are taken at a distance that does not permit examination of the depth or extent of the cracks. [*See* Pltfs. Exh. 64A at 5–6.] There are no measurements of the bulge or depth of the cracks. [*See id*.] In his October 3, 2022, report, Keller wrote that the "bulge has continually grown since [ ] we were first notified about it." [Pltfs. Exh. 64B at 2.] He compares two photos from April and May 2022 to new photos from September 27, 2022. [*Id*. at 2–3.] But these photos differ in their lighting and angles and do not provide the Court with a clear picture of the difference (if any) of the cracks in the wall. For the first time, Keller measured the interior bulge in the western foundation wall at 2 ½ inches. [*Id*. at 3.]

Keller's July 2023 report claimed further shifting inward of the exterior of the western foundation wall. [Pltfs. Exh. 64C at 3.] Keller for the first time estimated and measured the extent to which the exterior of the western foundation wall had pushed into the home (approximately 2 ¼ inches). [*Id*.] Using a different method than before, Keller calculated the bulge in the interior of the western foundation wall to be 2 ½ inches, the same as his September 2022 visit. [*Id*. at 4.] Keller documented what he described as "continued" growth of the interior cracks as well as new cracks he said did not previously exist. [*Id*. at 5–6.] For proof of the latter, Keller supplied a pair of photos with arrows added to draw attention to the supposed new cracks. [*Id*. at 6.]

I am uncertain whether the evidence presented demonstrates any substantial change in the state of the foundation walls since the Browns' acquired ownership of the

home. But I am entirely unconvinced that Scalise is responsible for any changes that may have occurred. There are obvious structural problems with these walls, but the walls were already damaged when the Browns bought the 208 Property. Keller's reports fail to provide a consistent measurement or explanation for the extent to which the foundation walls have continued to degrade. All I have are his anecdotal comments that things are worse, which are supported by photos taken at different angles and in different lighting. In fact, even though he used a different methodology (which presents its own problem) Keller documented no change in the bowing of the interior western foundation wall from his first measurement in September 2022 to his last measurement in July 2023.

In contrast to Keller's work, Scalise's expert (Todd Lesperance) supported his work with detailed, thorough observations and measurements of damage to the 208 Property. For starters, Lesperance's first report includes extensive written documentation of the basement, crawlspace area, and exterior of the foundation of the Browns' home. [Pltfs. Exh. 65A at 4–5.] He supported these written observations with voluminous photographs taken at various angles and locations for the interior and exterior foundation walls. [*Id*. at 31–40.] Some of these photographs included measurements of the depth of cracks and brick displacement. [*Id*. at 33–34, 36, 38.] Lesperance also matched the location of cracks on the exterior of the foundation to those on the interior of the foundation to see if they aligned. [*Id*. at 35, 37–38.] In some cases the cracks aligned and in others they did not.

Importantly, Lesperance employed a consistent methodology that relied on engineering and industry standards to explain his analysis and conclusions. Recall that Keller concluded "heavy equipment operating adjacent to this wall raised the soil pressure against the wall causing a large section of the wall to bulge." [Pltfs. Exh. 64A at 5.] Keller provided limited explanation or analysis to support this claim. By way of comparison, Lesperance in his two reports analyzed the depth and distance at which Scalise's activity could have applied pressure upon the 208 Property's foundation. In his first report, Lesperance estimated and calculated the depth of Scalise's utility trenches and the distance of those trenches from the 208 Property. [Pltfs. Exh. 65A at 6–7.] But as I have discussed above, the excavation and trenching work analyzed by Lesperance in this first report seems to have occurred entirely before the Browns' ownership of the 208 Property.

In his second report, Lesperance provided further analysis to calculate the distance from which the exact heavy machinery Scalise operated would apply force upon the foundation walls of the 208 Property. He first catalogued the two pieces of construction equipment Scalise identified as using and parking near the 208 Property. [Pltfs. Exh. 65B at 1–2.] He reviewed technical specifications for these machines to calculate their weight and the subsequent uniform ground pressure in pounds per square foot ("psf") that the vehicles exerted. [*Id.*] Lesperance compared these psf figures to the American Society of Civil Engineers' recommendation of 250 psf for sidewalks, driveways, and yards. [*Id.* at 1.] Lesperance calculated that Scalise's CAT 304 CR Excavator was within the 250 psf range, while his CAT 287B Skid Steer Loader was 5%

over the 250 psf range at 263 psf. [*Id.* at 1–2.] He concluded that Scalise's construction equipment was at or near the permissible psf range for use in Scalise's yard and the easement area and in fact applied less psf than numerous personal pickup trucks and cargo vans would have. [*Id.* at 2.]

Finally, Lesperance also calculated the "zone of influence" within which the weight of Scalise's vehicles and equipment could apply pressure upon the foundation walls. [*Id.* at 2–4.] Lesperance explained that the zone of influence extends upward and outward at a 45-degree angle from the base of the 208 Property's foundation walls, which results in a 1:1 distance to height ratio. [*Id.* at 2.] Using his calculations of the depth and width of the concrete footing at the base of the foundation, Lesperance calculated the zone of influence around the 208 Property to be approximately 2 feet 8 inches. [*Id.* at 2–3.] Lesperance estimated the distance of Scalise's construction activities from the 208 Property and concluded that they fell outside this zone of influence. [*Id.* at 3–4.]

Lesperance has persuasively explained how Scalise's construction activities most likely did not cause the cracking and other damage to the foundation of the 208 Property. And while I decline to adopt his analysis concerning the alleged tree that may have damaged the 208 Property's foundation, I still found this commentary valuable because it demonstrated that Lesperance's process involved identification and analysis of other potential causes of damage to the 208 Property. Keller's process did not, and he instead adopted Brown's explanation wholesale. The Browns failed to convince the

Court by a preponderance standard that Scalise's construction activity caused the alleged damage to the 208 Property.

The Browns' assertion that Scalise directed his downspout over the course of many months in 2020 at their western foundation wall is even less supported by the evidence. The Browns offer only a few photos from January 2020 that show the downspout from Scalise's 206 Property pointed towards the 208 Property and an email Brown sent to Scalise's former attorney on January 27, 2020, concerning the same. [*See* Pltfs. Exh. 17 at Bates 34; Pltfs. Exh. 16 at Bates 100.] The Browns provided me with no concrete evidence to understand how long this downspout was pointed at their property. Scalise testified that he promptly moved the downspout and Brown testified that he did not move it for months. As I stated above in my Findings of Fact, I credit Scalise's version of those events. Brown's claim that six months went by without the issue being addressed is simply unreasonable. Brown was a prolific documenter and energetic emailer. Yet nothing corroborates her claim that the water was spewing onto her foundation for six months without her saying anything about it. The Browns offer no other dated photos that show the downspout continuing to point at their 208 Property. In fact, Deborah Brown did not raise the downspout issue in her March 30, 2020, letter to Scalise, which suggests the issue may have already been resolved. [*See* Pltfs. Exh. 12.] The Browns have presented barebones, scattershot evidence on this point that is insufficient to support a finding that a downspout from the 206 Property directed water at the 208 Property over the course of any significant period of time.

There are simply too many breaks in the causal chain to conclude that Scalise's construction activities proximately caused damage to the 208 Property during the Browns' ownership. The Browns rushed to buy an old beachfront home built in the sand some 80 years prior. They did so almost sight unseen without any inspection. The Browns did not even lay eyes on the interior of the 208 Property's foundation until four months after they purchased the house. Two years later they then decided to call in an engineer to assess their property in the context of litigation. That engineer provided no consistent methodology to explain or measure the damage to the 208 Property and instead seems to have taken Brown at her word. For these reasons, I conclude that, by a preponderance of the evidence, Scalise's actions do not fall below a reasonable standard of care. And even if they did, the Browns' evidence of causation falls short. The Browns failed to present evidence that linked Scalise's actions as the proximate cause of damage to the 208 Property during their ownership. Given these findings, I also conclude that the Browns failed to prove their claim for exemplary damages under I.C. 34-24-3-1. I therefore award the Browns no damages.

The Browns' separate requests for lost rental income and loss of use also fail. The Browns presented no evidence of their efforts to rent the 208 Property or for loss of an alternative use. To the contrary, it seems the Browns were in no rush to render their 208 Property habitable or take other action for its use. As just one example, the Browns waited a full year, from July 2020 to July 2021, to reconnect sewer service to their 208 Property. The Browns cannot plausibly argue that they lost the use of or rental income for this period when they took no action to restore basic plumbing to their home.

Moreover, throughout their ownership the Browns have been pondering whether to remodel or do a full demolition and reconstruction of their home on the 208 Property. It seems the Browns were themselves unsure how best to use their property, were slow to fix issues that rendered the home on the 208 Property uninhabitable, and they simply presented no concrete evidence of their intention to rent the 208 Property. I will therefore deny the Browns' requests for lost rental income damages in the amount of $80,000 or other damages for loss of use.

## Conclusion

Based on the foregoing findings of fact and conclusions of law, the Clerk of Court is instructed to enter judgement as follows:

It is hereby **ORDERED** that Rosario Scalise pay David Broitman as Successor Trustee of the Fred Broitman Living Trust Under Trust Agreement Dated January 30, 1996, the sum of **$19,600** in property damage incurred due to Scalise's negligent conduct.

It is further **ORDERED** that judgment be entered in favor of Rosario Scalise and against Gerry and Deborah Brown on their claim for property damage.

It is further **ORDERED** that judgment be entered in favor of Scalise on his counterclaim against Gerry and Deborah Brown for declaratory relief and the judgment shall **DECLARE** that the Easement on 208 Louisiana Avenue, Michigan City, IN 46360 (servicing the property on 206 Louisiana Avenue, Michigan City, IN 46360) remains in Full Force and Effect.

It is finally **ORDERED** that judgment is against Gerry and Deborah Brown on their request that I declare the easement on the property located at 208 Louisiana Avenue, Michigan City, IN 46360 (servicing the property on 206 Louisiana Avenue, Michigan City, IN 46360) to have been abandoned by Rosario Scalise.

**SO ORDERED**.

ENTERED: May 12, 2025.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT